By late this afternoon, it can get pretty warm. We'll get that taken care of. The first matter is Edgar v. Avaya. Mr. Rifkin, are you ready? Yes, sir. Good. Good morning, Your Honor. May it please the Court, my name is Mark Rifkin on behalf of the Appellant, Jane Edgar.  Fine. The principal issue in this appeal is whether the Court's decision in Munch v. Robertson created a pleading standard for breach of fiduciary duty claims against non-ESOP ERISA trustees. This is a question the Court did not answer in the Munch v. Robertson case, and then several years later when the Court decided the Sharon Plow ERISA litigation, it noted that the question remained open and it did not take that opportunity to address the question either. In Munch, the Third Circuit struck a balance between two congressional purposes that are reflected in ERISA. One is a purpose for encouraging employee stock ownership plans, ESOPs, and the other, of course, is the broader interest in protecting the rights of all retirement plan participants. And the Court balanced those two competing interests by adopting a presumption of prudence whenever ESOP trustees act in accordance with the express ESOP purpose, which is to allow employees to acquire employer stock. It does seem to me, Mr. Rifkin, that individuals performing the functions of fiduciaries in the ESOP context are basically doing the same thing as individuals who invest in employer securities in the EAIP context. They're doing the same thing. Why should we treat them differently? Why should we impose different standards when they're really doing the same thing? Your Honor, I think the answer to that question requires us to look at two different facts, the most important of which is the settler's intent behind the two kinds of plans. For example, in Munch, in the ESOP plan, the primary purpose for an ESOP is to allow employees to acquire company stock in a tax-advantaged transaction. All of the ESOP plans have that as their primary purpose, and most ESOP plans, if not all ESOP plans, permit or indeed instruct the trustees to acquire up to 100 percent of the assets, to invest up to 100 percent of the assets in company stock. That is the specific plan for which employee stock ownership plans are created. The ESOP provisions of ERISA reflect that purpose, and here in the Munch case, the Court had that congressional purpose in mind and balanced it against a broader congressional purpose of protecting retirement income. In the case of EIAPs, eligible individual account plans, like the plan here in this case, the settler's purpose may or may not be the same as the ESOP settler. For example, in this case, the purpose for the trust was not to invest primarily in employer securities, but rather was to provide a mechanism for employees to save for their retirement. That is a fundamentally different purpose than the ESOP purpose, and when this Court decided Munch, this Court had to reconcile two conflicting statutory purposes. One was protecting ESOPs, and one was the broader purpose of protecting all retirement income. We don't have that conflict here. What we have here is a settler's purpose, which was to provide for safe retirement savings. Now, consistent with that... Do you disagree, then, with the idea that in both instances what we're talking about is fiduciaries making decisions involving investment in employer securities? No. Respectfully, I don't disagree with the fact that what the fiduciaries are asked to do is essentially the same activity. They are asked to decide whether to invest in employer securities or not. But in carrying out that activity and making that decision, the principal touchstone for their action must be the settler's intent. And in the case of an ESOP, the settler's intent is clear. The trustees are instructed that they should primarily invest the assets of the plan in employer securities. In this case, in the Avaya plan, the settler's intent was not that. The settler's instruction was that the trustee should protect retirement savings. And so I think that when, in the case of an EIAP such as this, when the trustee carries out that same function, the trustee must always be mindful of the settler's purpose. That's the guiding principle by which this court's decision in Munch was based. It's the guiding principle by which the trustee's conduct must be based. And ultimately, I believe, it guides the courts in how they should approach an allegation such as the one that Mrs. Edgar makes, that the trustees were imprudent in doing so. The balance in this case is fundamentally different than the balance in the case of an ESOP. Here, the court has to balance that overall purpose, that settler's overall purpose, which was promoting safe retirement savings, with the settler's intention that plan participants be allowed to invest at least some portion of their savings in company stock. Now, this plan, this plan in particular, did not set any specific percentage, any limitation, any cap, one way or another, on how much of the stock should be, how much of the assets of the plan should be invested in company stock. In a case from the Ninth Circuit that we have read about in the briefs, a case called Wright v. Argon, that allurgical, there, the plan also specified that the trust could acquire or invest up to 100% of the assets of the plan in company stock. Now, the Ninth Circuit took a slightly different approach toward the question and disagreed with this court's, what they characterized as this court's, intermediate approach to trustee liability. I think the court would have favored, the Ninth Circuit would have favored, a strict protection for trustees who are told to invest primarily in employer securities, but the court said it didn't matter because even under the presumption of prudence, it was the plaintiff couldn't state a claim. I'm sorry. I don't want you to spend all your time on this issue, on the presumption. At some point, I want you to address, even assuming there is no presumption here, why isn't this just a missed earnings forecast? I mean, this plan made a lot of money for a long period of time and didn't make as much as you thought at the time. The reason why you brought this suit. Why is this exceptional? I will address that now, Your Honor. Respectfully, I believe that the plaintiffs and the defendants make a somewhat different view of the facts in the case, particularly the performance of the company. I'm sure we'll turn back to the presumption of prudence, but let me explain to you now what I think the issues are, the factual issues. The district court said that this was a case of a missed earnings forecast and a one-day drop in the price of the stock, followed by a subsequent rebound in the price of the stock, and it's been a profitable investment for the plaintiff participants. We respectfully disagree. In our brief, in our reply brief, we included a chart, which we compiled from the Bureau of Finance. What we did was we charted the performance of the stock during the class period, and then, in fact, we took it through October of 2006 when we submitted the reply brief. What we demonstrated was that during the class period, Alliance Stock underperformed the market by approximately 40%. In absolute terms, the stock lost about 25% in value when the company made its announcement on April 19, 2005 of the problems, but relative to the performance of the market, which is the appropriate measure in this case, I think, because the damages in illicit cases are not just the absolute loss in the plan, but also the absolute loss relative to the performance of other more prudent investments. So we just simply used a broad market index as a substitute, and we illustrate that even today. This plan has underperformed the market by approximately 40%. The plan, in absolute terms, lost about 15% in value, and over that same period of time, the market more generally gained about 25% in value. So if you look from the beginning of the class period until when we filed our brief, there was a 40% loss in the savings that Avaya Plans participants had as a result of the decision to let them stay invested in company stock. What do you suggest should have been done exactly, and when should the fiduciaries have taken action? Your Honor, we have alleged that there were five problems with the company, and I believe as soon as the trustees began to be aware of any of these problems, but certainly when they became aware of all of them, they should have immediately taken steps in the first instance to halt any continued investment in Avaya stock for the plan, and they should have considered whether it was prudent at that point in time to follow an orderly liquidation of the stock that had already been accumulated in the plan. Let me just briefly summarize for you the five particulars that we went through in the complaint. First, we talked about the cost of integrating a company called Tenovus, which Avaya acquired, and we said in 2005, rather than being accretive to earnings, it was in fact that acquisition was reducing earnings. We said that the company's change in its method of delivering products was creating severe disruptions in sales. We alleged that Avaya was experiencing a dramatic reduction in the demand for its products in the United States, and we said that Avaya had no basis to project an increase in profits or revenues in 2005. None of that information was conveyed to the plan participants, and as importantly, none of that information was conveyed to the market until April 19, 2005, so the trustees should have known that the stock would have been inflated because the market was not able to assimilate information it didn't have, and lo and behold, when the information was disclosed, the plan immediately lost 25% in a day, and it has not recovered. So we say simply that during that glance period, the trustees failed to consider this at all. They mechanically and wittingly simply invested in Avaya Securities without giving consideration to these factors, and if they had, they would have stopped plan participants from making further contributions, and they wouldn't have considered whether it was appropriate. I'm sorry. Didn't the stock recover from its value at the time the information was, as you claim, known to the fiduciary? The stock reached the bottom, as it were, on April 19 when it dropped 25%, but it did not immediately recover. In fact, it stayed at roughly that range in July of 2005, about three months later. It was almost exactly at that same price. It does take the market some time to determine whether a company has corrected its problems, has addressed its problems, and whether the market will continue to invest in the stock. We believe that it was not until October 2005 when the trustees could safely have said, we think this has all been borne out now and we can resume investing in Avaya Securities. I see my time is up, but if the court has any additional questions, I'm happy to answer them. We'll give you three more minutes. Your Honor, I did save time for rebuttal. Should I continue now? Yeah, we'll give you three more minutes. The other point that I would like to emphasize is that the district court applied the munch presumption as a pleading standard, and we believe that is not the correct way that the lower court should have considered the presumption. If the court decides a presumption is in order in this case, it's an evidentiary presumption, and the court was very clear that the presumption could be rebutted by proof at trial, and of course munch was a summary judgment decision. Is there any significance to the plant's requirement that the fiduciaries invest in Avaya stock? Yes, I think that that is a factor that the fiduciaries are entitled to consider, but I think that's all they should do is they should consider it. They should not wittingly, absolutely, and mindlessly follow it as we believe they did. Moreover, unlike other companies, the plan in this case does not set a target or a goal or even a limitation, and so if you allow participants to invest, for example, in Avaya stock, we believe it would have been appropriate, it would have been consistent with the plan, and it would have been the proven thing to do to limit the amounts that employees could contribute in Avaya stock at any point in time during the class period to say 10 percent or 15 percent or no more than 5 percent or whatever may have been the case. They could still have offered the stock. They would not have had to breach the agreement, but more importantly, they would have stayed true to and would have followed the overall set order's purpose of providing for safe retirement savings. We believe that the appropriate approach in a case like this, which is vastly different than the other cases we've discussed, is for the court to say that it is not a per se violation of the duty of prudence for trustees in such a case to allow plan participants to invest in company stock, but that they are subject to the overall duty of prudence without the protection of the presumption that the court applied in a case where the trustees were supposed to follow a purpose of investing primarily in employer securities. We just think that the presumption in this case simply goes too far. There's no conflict in the statutory provisions here that the court would need to balance by adopting a presumption the way it did in Munch. We think Munch was appropriately decided given those conflicting statutory purposes, but we just don't see that here. We think it's better for the court to say, follow the rules. You are subject to a duty of prudence. You don't get any special protection, but you are not per se liable for losses on employer stock, provided that it was prudent for you to have invested in that stock. Thank you very much. Any questions? Good. Thank you very much. We'll have you back in a little while. Mr. Henson. Good morning. May it please the court, my name is Doug Henson. I am representing the appellees in this case, and I appreciate your time to discuss the very important issues that I believe are raised in this appeal. I'd like to sort of follow the same outline that plaintiff's counsel did in presenting his argument and respond to some of the same questions that the court has already raised, starting with this issue of the sponsor's intent, because I think that's a key element both in his argument and in our papers that we filed. We think it's very clear that the sponsor's intent included an intent that one of the options available in this savings plan be the employer stock. I mean, that's clear by the requirement that says it shall be one of the investment options in this plan. There's no wiggle room in there. There's no, frankly, there's not as much wiggle room in that statement of intent as there was in the language of the plan in March, which said it shall be primarily invested in employer securities. Here, it's absolute that there shall be an investment option available to the participants, and that is as much of the plan sponsor's intent as any other aspect of the plan document itself. We believe that that does create tension, then, and does create, frankly, a burden on the fiduciaries to follow that aspect of the plan. One of the fiduciary duties under ERISA is, in fact, to follow the terms of the plan, and that's also one of the basic tenets of trust law, and that was the same conflict that was discussed at length in March. What do the fiduciaries do, given that mandate, and given the red flags all over the place that suggest that the stock is in for a big problem? If there were red flags all over the place, then I think, as the Munch Court pointed out, it does get to a certain point where the settler's intent can be changed by subsequent circumstances, and I think that's the line that the Munch Court was trying to draw, was when those red flags become so overwhelming that, due to changed circumstances, the plan sponsor would no longer intend for there to be an investment option in employer stock, then that's the point at which the fiduciaries of the plan can and should remove the stock from the plan. That was the finding of Munch, and I think that's a valid finding under those circumstances, and, frankly, I think it's a valid finding to apply in this case. If the court wanted to impose the same Munch standard to these facts and these circumstances, I think that would be perfectly appropriate. I also maintain that there isn't a duty at all, frankly, under the statute, to diversify the assets in employer stock within this plan. That's what counsel was actually driving at at the end of his argument, is that instead of an outright ban on the stock, perhaps there should be a limit on the amount of stock that individuals could hold. That is, in fact, the heart of the duty to diversify, and that is the heart of the duty that employers and, excuse me, fiduciaries are expressly exempted from by 404A2 of ERISA. That provision of the statute is what's at issue in this case, not the Munch standard. The standard at issue in this case is what does 404A2 of ERISA, which expressly provides an exemption in its entirety of the duty to diversify with regard to employer securities in these plans, plus an exemption from the duty of prudence to the extent prudence would require a duty to diversify in these circumstances. That is the heart of this case, and frankly, I think it was the heart of the Munch decision as well. It's the only statutory basis for the Munch presumption as it has come to be known around the country. Therefore, we believe that presumption, which clearly on its face applies, I mean, the plaintiffs admit that this was an eligible individual account plan, an EIAP, which is expressly within the confines of that exemption. That exemption does not apply just to ESOPs. ESOPs are one kind of EIAP, but so is this plan as a savings plan, one of those types of plans that Congress sought to protect with regard to employer securities and set up this express exemption. There's really no dichotomy in the statute itself between ESOPs and other types of EIAPs when it comes to the fiduciary's duties with regard to employer securities. The plaintiffs have spent a lot of time in their briefs trying to make this difference appear, and true enough, Munch only dealt with an ESOP and therefore only spoke in terms of ESOPs, but it relied for its decision on that aspect 40482 of ERISA and the trust law, and those are the same exact principles that we are arguing here today, 40482 of ERISA and the trust law, which mandates that fiduciaries follow the terms of the plan unless it's illegal or impossible to do so. And we believe that is in fact the situation here with regard to the presumption, if you want to call it that, but what I would prefer to refer to it as is the exemption provided by 40482 of those specific fiduciary duties under ERISA. At some point, the fiduciaries can't blindly follow the terms of the plan? I believe that's correct, Your Honor. I believe that there is a point at which it becomes illegal to follow the terms of the plan, and I think the… Illegal by reason of? Well, illegal essentially by reason of the fact that it has become so patently imprudent in a sense or so patently wrong to again follow blindly the sponsor's intent as articulated in the plan when there are sufficiently changed circumstances. So how would you define the standard? How would you write it? I think that the court in Munch did a pretty decent job of defining that standard, although I think if anything it is a more strict standard with a plan like ours where there is in fact a mandate, not a middle ground as the Munch court referred to it. The Munch court actually said if stock was required to be included, then the only way it gets taken out is if it's impossible or illegal. And it said that it didn't find that it was required to be in the Munch plan, but it was a middle ground between simply permitted and required. That's what an ESOP created. We believe that we're actually in that required field where it's impossible or illegal, and so the standard would be perhaps Munch to a next level that would be in fact virtually certain that this company was headed towards bankruptcy or on the brink of collapse or something that would cause a permanent irreversible loss of plan assets here. You're getting away from the presumption of prudence standard that Judge Kugler seemed to adopt in the district court. Your Honor, I believe that that is a workable standard, but we believe the standard is actually even stricter. We think that the standard is really more what the Wright court articulated and what some other district courts have articulated, that essentially in virtually no circumstances would you require fiduciaries, second-guess fiduciaries who follow the terms of those plans, that no duty to diversify simply means that. No duty to diversify. So the plan says what the plan says, and you just look at that, and that should dictate the result? Well, again, Your Honor, I believe that there is a fallback provision under the illegal aspect of what the plan sponsor is required to do. If it is in fact illegal, if it violates Title I of ERISA in some way, then I believe that gives the fiduciaries the opportunity to in fact go against the terms of the plan. But in terms of articulating what that standard is, I think it is difficult to articulate because we frankly just don't have the facts and circumstances in this case or frankly many others. Now perhaps Enron or WorldCom presents those types of situations. This case with its, I think uniquely, other end of the spectrum facts, merely a missed earnings projection, not earnings reports now, just a projection of earnings that then caused the stock to drop one day. And there was a lot of discussion about whether that stock came back, and I want to make sure that the record is clear and that we are clear on this point. It went from over $10 a share down into the $8 a share range. It was trading back above $10 and back above the price that it held before that 25% drop in July of 2005. Within 90 days, this stock had fully recovered. Everything that it lost upon the revelation, as the plaintiffs describe it, of those problems, those fundamental problems with the business that they say should have caused the plan fiduciaries here to turn away from the terms of the plan. That temporary 90-day drop in the price of the stock cannot be enough. It doesn't come close to the types of circumstances that were involved in Munch or Enron or WorldCom What about the general underperformance that Mr. Rifkin has cited? I'm curious about that because that's not actually alleged in his complaint, but if we take his charts as true, what he has compared the stock to is what he calls the market, which I guess is the Russell 2000 in his mind. We actually looked at it compared to the competitors of Avaya. The businesses that are in the same line of business as Avaya, and it does much better, as you might expect. It tracks much closer to those companies' performance during the same relevant time period. But that, I think, is getting into a factual issue that we frankly don't need to get to because it's not alleged in the complaint. What's in the complaint are those fundamental problems, as it's alleged, that were revealed on April the 19th and which caused that 25% drop. We think that this whole case is really answered by the fact, and I think Judge Chesler agreed with this, that because that 25% drop was recovered so quickly, within 90 days, that that does not indicate that there were fundamental problems with this company. Does that factor work towards the question of damages, or is that a factor that is appropriate to consider on the liability issue? I think it's appropriate. I think it has to be considered on the liability issue because, again, what we're looking at is what is the fiduciary's duty? At what point does a fiduciary have a duty, a legal duty under ERISA, to step in and go against the planned terms that require there be one of these, to be the employer investment option? That's not a pleading standard. That's not a proof standard. That's the standard of conduct to which these allegations have to be applied to see if there is a breach of duty in the first instance. And we maintain that if you take all of those facts as true, perfectly true, and accept them as you're required to do on a Rule 12 motion, it still does not come anywhere close to meeting the standard that would be required to prove a breach of fiduciary duty, to establish a breach of fiduciary duty. That allows this case to be dismissed under Rule 12b. And, in fact, we think that Judge Chesler's subsequent rulings in other cases demonstrates that. He hasn't dismissed all of the similar cases like this that have come before. In fact, this is the only case that he's dismissed on a Rule 12 motion that's similar to this one. And he did so because the facts are so uniquely bad for the plaintiffs. It just doesn't come anywhere close to meeting those egregious standards that would be required in order for the fiduciaries to override the terms. Well, let's assume you're right on the facts. Tell me again why this is a pleading standard and not something that would be considered on summary judgment. I know the Ninth Circuit did that in Wright, and the facts may have been different in Wright, but I'm still not sure I understand why it's a pleading standard. I would articulate it as a pleading standard. I don't think it is a pleading standard. Why are you on 12b-6? I'm here on 12b-6, but I think the standard is a standard of fiduciary conduct that has to be decided on 12b-6. I mean, if the standard is whether you breached the contract or not or if the standard is whether you were negligent or not, the standard is what causes the breach of the legal duty, okay, and what is the legal duty that's at issue. That's what we're talking about when we talk about the standard that's in play here. It's not a pleading standard. It's the legal standard for the conduct at issue, whether, in fact, that conduct can constitute a breach of duty when the statute expressly says there is no duty to diversify employer stock in these plans and no duty of prudence to the extent prudence would require diversification under these plans. Do you agree that there is no breach of duty because there is no breach of contract? No, no. I was using the breach of contract analysis as a way to illustrate to the court what I was trying to say. If this was a breach of contract case, we would all agree, I think, that the standard is whether there was a promise that's been breached, and that's not a pleading standard. That's the legal standard for the claim at issue, and in the same way I believe that this is not a pleading standard. It's the legal standard for the claim that is at issue, whether the conduct alleged violates ERISA fiduciary duties as they are set out in the statute. In much the district court, or I'm sorry, this court, looked to congressional intent and wanted to make employees capitalists. How does that differ or how does that apply to what we have before us? I think it applies exactly the same because here the plan sponsor was not saying that this plan was primarily directed towards employer securities, but it did say very clearly that one of the things that was important to the employer here was that employer securities be offered as one of the investment options in this plan. All of the congressional intent that supports employer securities in these plans goes into the same analysis as to what the proper standard is under 40482. That's why 40482 is in the statute. But the Munch plan used the term primarily, and this one did not. Right. This plan I think goes beyond primarily. This plan says absolutely it has to be an option, and that's all it was. Nobody was ever required to be in this stock. This was totally the participant's choice to be in the stock. In fact, the investments that were made were only those made by choice, by participants, and that's all the plan sponsor required. But the plan sponsor did require that, and that aspect of the plan sponsor's intent I think is every bit as important as the plan sponsor that sponsors an ESOP and therefore wants to have the investments primarily in stock. So, Mr. Henson, in reviewing the fiduciary's conduct in this case, your view is that we first look to what the term the plan provides in regard to whether we discharge their duties properly, and that might be game, set, and match. If not, then we might consider other standards. That's exactly right, Your Honor. I think if the plan does in fact control the issue that is before the court in the form of a claim, in other words, whether the stock should have remained in the plan, if the plan speaks to that, then the plan does in fact control unless and until it becomes illegal to follow that term in the plan. And here we would suggest that the circumstances never came anywhere close to making it illegal to follow the terms of this plan. So if the fiduciary sees a situation where we've got to get rid of this stock because the company's in real, real trouble, so they divest the plan of virtually all of the company's stock, they then can be sued under the plan because they didn't follow the terms of the plan to invest in the company's stock. They're absolutely subject to that type of lawsuit. In fact, Munch identified that as one of the concerns that it was addressing with the discretionary review of the fiduciary's decision in this context. There has to be discretion given to the fiduciaries because of the dilemma that they face of, frankly, being sued either way. And therefore, fiduciaries that Munch Court found were entitled not to a de novo type of review in those circumstances but to a discretionary standard of review, and that's what we believe should be applicable here. Thank you. Thank you. Mr. Henson, any other questions? Mr. Henson, thank you very much. Mr. Ritter. Your Honor, I'd like to begin by trying to clarify some of the issues about the price of the stock. On page 4 of our reply brief, we set out a chart that we reprinted directly from Yahoo. We began the chart on the first day of the class period, and we showed the price of Avaya stock, and we showed the price of the Russell 3000 index. If you leave the Russell 3000 index apart, Avaya stock fell from the beginning of the class period, fell by almost 40%, more than 40% when it reached the bottom on April 19th. I believe the reason for the so-called factual dispute here is because the defendants only want to look at the period a few days before the announcement on April 19th, by which time the price of the stock had already declined about 22%, and so they only want the court to look from the middle of the class period to the end of the class period. If you simply look at that chart, you will see that from the beginning of the class period to the end of the class period, the stock dropped over 40%, and it has never fully recovered. But I believe that these are all factual issues that are beyond the scope of a motion to dismiss. I would like to address Mr. Henson's comments about the fact that this plan is stricter than the plan in Munch. I was surprised to hear that because it simply isn't. In Munch, the plan provides as follows, and I'm reading directly from the court's opinion. The trustee shall invest all contributions received under the terms of the plan, not applied to the repayment of principal and interest on accrued loans, in ESOP stock. Now, Mr. Henson made some argument about the fact that the plan here says it shall be invested in company stock. Yes, the plan says that company stock shall be offered. It doesn't say that all of the assets of the plan, except what's needed to repay loans, shall be invested in company stock, like the plan said in Munch. The plan in Munch had the exact same word, shall. The only difference is, in Munch, the plan said all of it, except what you need to pay loans, all of it shall be invested in company stock. There is no doubt that the purpose for this plan in our case provided far greater discretion on the part of the trustees whether they were going to limit, restrict, or eliminate investments in Avaya stock during the class period than the ESOP in Munch. What do you say is the proper standard for revealing the exercise of the trustees' discretion? I think that the standard is exactly the one this court articulated in the Unisys case. I think the court got it right there, and I think the court should continue to follow that standard. A fiduciary is required to investigate the safety of investments and the potential for income. They must use at least ordinary intelligence. They must use caution with a view to the safety of principal. And securing reasonable and regular income. I think they must conduct an adequate investigation, and I think they are not permitted to blindly follow plan documents. Precisely what we allege Avaya and the other defendants did here, that they simply blindly followed the plan documents and allowed the participants to invest in Avaya stock without any restriction, without any limitation, and without giving any consideration whatsoever to whether that should have been eliminated. The first part of the Munch court decision, the first half of that decision, is the court's analysis of why, in the absence of such a deliberation, the court will not protect the decisions of the trustees, the actions of the trustees. And that's why in Munch the court said, we will conduct a de novo review of the actions of the trustees in an ESOP, because there is no evidence in the record on summary judgment that these fiduciaries ever considered what they were supposed to do with the stock. Now that's exactly the problem here. And so I believe that even if the court were to follow Munch, the conclusion from the first half of Munch is that under the facts alleged in this complaint, the Avaya trustees are not entitled to any presumption. I don't think the presumption should be applied here for the reasons I've said. I don't think it should be applied now for the reasons I've said. But I also believe that consistent with the allegations in the complaint, even if the court were going to follow Munch here and now, you still must allow this complaint to survive because we have alleged that the trustees failed to consider facts other than simply blindly following the direction of the plan that they must offer Avaya stock to plan participants. Any other questions? Thank you very much. Thank you very much. The case was very well argued. The court would like to have a transcript of the argument, and I'll ask you to check with the clerk's office when you leave and to share the costs of providing us a transcript of your argument. Thank you for the job. Well done. Briefs were excellent. We'll take the matter under your consideration. Thank you, Your Honor. Thank you very much.